**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **CHAPTER 12** |
| KEITH'S TREE FARM, | ) | |
| | ) | **Case No. 15-71262** |
| Debtor. | ) | |

| | | |
|---|---|---|
| GRAYSON NATIONAL BANK, | ) | |
| | ) | **MOTION TO PROHIBIT USE** |
| Movant, | ) | **OF CASH COLLATERAL** |
| | ) | **(Docket No. 12)** |
| v. | ) | |
| | ) | **MOTION TO DISMISS** |
| KEITH'S TREE FARM, | ) | **CHAPTER 12 CASE** |
| | ) | **(Docket No. 32)** |
| Respondent. | ) | |

| | | |
|---|---|---|
| CHRISTOPHER T. MICALE, | ) | |
| CHAPTER 12 TRUSTEE, | ) | |
| | ) | |
| Movant, | ) | **MOTION TO DISMISS CASE &** |
| | ) | **SUPPLEMENTAL MOTION TO** |
| v. | ) | **DISMISS CASE** |
| | ) | **(Docket Nos. 29, 36)** |
| KEITH'S TREE FARM, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

The primary matters before the Court are objections to confirmation and motions to dismiss this case.  The Debtor, Keith's Tree Farm (the "Debtor"), is a tree farming operation in Wythe County, Virginia that has filed Chapter 12 bankruptcy cases in this Court multiple times, most recently in August 2013, Case No. 13-71316 (the "2013 Case").  After four failed attempts to confirm a Chapter 12 plan, the 2013 Case was dismissed without leave to amend in October 2014, and the Court's rulings on both dismissal and leave to amend were affirmed by the District

Court on August 4, 2015.[1]  The current case was filed one month later on September 4, 2015.

After opportunity for pre-trial discovery, a lengthy evidentiary hearing was conducted on the

various objections and motions in this case on February 11, 2016.

The Court has carefully considered the rulings in the 2013 Case and what has transpired

since those rulings were issued.  The Debtor has made some progress since the last case,

including an apparent change for the positive in both the Debtor's leadership and its bookkeeping

staff.  However, even with those changes, and with the liquidation of some of the Debtor's real

estate, which proceeds paid down a significant portion of its secured debt, the Court does not

believe the record establishes that a viable plan can be confirmed in this case.  Thus, the case will

be dismissed without leave to amend.

## Factual Background

The Debtor appears to be a Virginia general partnership with its principal place of

business in Austinville, Wythe County, Virginia.  The Debtor's tax returns reflect that its two

partners are Larry Wayne Keith ("Larry Keith") and Terry Lee Keith ("Terry Keith").  The

Petition in this case was filed by "Curtis Keith, Partner."  Curtis Keith is the father of Larry

Keith and Terry Keith, but no document in evidence indicates that Curtis Keith has any actual

ownership interest in the Debtor.  The testimony at trial, and the Court's prior rulings in the 2013

Case, reflect that while Curtis Keith is the long time patriarch of the family business, his

involvement in the Debtor as to the outside world changes in his favor as his circumstances

necessitate.  While he was an active partner in the business in years past, he apparently dropped

the membership interest in order to qualify for Social Security disability, but he has resurfaced as

---

[1] The 2013 Case was presided over by the Hon. Rebecca B. Connelly, Chief Judge of this Court.  Judge Connelly's ruling on dismissal in the 2013 Case is set forth in *In re Keith's Tree Farms*, 519 B.R. 628 (Bankr. W.D. Va. 2014). The District Court's opinion affirming Judge Connelly's ruling is set forth in *Keith's Tree Farms v. Grayson National Bank*, 535 B.R. 647 (W.D. Va. 2015) (Conrad, J.).

a partner in the filing of this most recent case—again, with no documents to substantiate his oft-changing interest.

Curtis Keith is currently in an assisted living facility undergoing rehabilitation for significant health issues, and his future return to the business is uncertain, at best. Terry Keith is in charge of the Debtor at the moment, and its operations provide the sole means of support for him and his family.  Larry Keith left the family business several years ago, but he helps his brother on an as-needed basis.  Larry Keith's full time occupation is running his own cattle farm, which is a separate business.

The Debtor has been in operation since 1991, and it grows Christmas trees and ornamental trees for landscaping.  It also makes and sells decorative roping, similar to a garland. It sells its inventory to various retailers, primarily in the northeast.  The Debtor also operates a related business trucking its tree inventory, and it takes on various hauling jobs for third parties to fill in revenue gaps.  In years past, the primary bookkeeper of the business was Curtis Keith's wife, Verna Keith.  She was not a trained bookkeeper, and glaring deficiencies in the Debtor's financials and projections were a significant factor in the dismissal of the 2013 Case.  Since the dismissal of that case, the Debtor has retained Marion Ayers, an experienced bookkeeper, to assist the business, and she has moved its bookkeeping to a well-known computer based platform.

By his own admission, Terry Keith is more comfortable working in the growing operation and running the production side of the business than he is with the financial side, with which he has yet to become completely familiar.  He is an earnest and credible witness, and clearly devoted to the tree farming business, which is his life's work.  However, his father

always handled the business side of the farm, and with his father's illness, the financial

responsibilities are now thrust upon him.

The Debtor's primary secured creditor is Grayson National Bank ("GNB"), an area

community bank with a large agricultural portfolio.  It is an experienced lender in making

agriculture loans, and it frequently competes with other lenders in its market area for such loans.

GNB is secured by the Debtor's real estate and improvements identified as follows: (1) a 144.5

acre property located at 1071 Pauley Flatwoods Road, Austinville, Virginia 24312-3608 (the

"144.5 Acre Tract"); and (2) a 15.5 acre property located at 1023 Pauley Flatwoods Road,

Austinville, Virginia 24312-3612 (the "15.5 Acre Tract") (collectively, the "Real Property").

GNB contends it is also secured by certain of the Debtor's personal property, including several

titled and non-titled vehicles, all farm products and supplies, crops, trees, timber, goods,

equipment, accounts and all proceeds and products thereof.[2]  James Young, a senior vice

president and senior credit officer of GNB, was the bank's representative at trial.  He is familiar

not only with the structure of various types of agricultural loans, but also their pricing in the local

lending community.  Mr. Young testified that the Debtor was indebted to GNB as of the trial

date in the principal amount of $738,532.47, plus accrued and unpaid interest of $464,340.53,

late charges of $65,427.23, and "other escrow" fees of $8,750.00.  Thus, the total indebtedness to

GNB was $1,277,050.23.  Mr. Young could not elaborate specifically as to legal fees and

foreclosure expenses.

Since the last case was dismissed at the Bankruptcy Court level, GNB has received the

following payments from the Debtor or on the Debtor's behalf to reach the current loan balance:

(i) a $50,000.00 payment in exchange for GNB agreeing to a stay pending appeal of the

---

[2] At trial, the Debtor disputed the validity of GNB's personal property lien, but no objection to GNB's secured claim is filed to date, nor has an adversary proceeding been filed to challenge the validity, priority or extent of GNB's lien on any collateral.

4

Bankruptcy Court's ruling in the 2013 Case to the District Court, (ii) $414,378.16 in net foreclosure sale proceeds[3] from four parcels that the Debtor agreed to allow GNB to take to foreclosure, (iii) $10,000.00 in December 2015, and (iv) $15,000.00 in January 2016.[4]  The foregoing payments total $489,378.16.  All parties conceded at trial that the foreclosure sales were productive sales given the values realized on the real estate sold.  None of the parcels sold were obtained by credit bid by GNB.  However, certain of the parcels sold totaling 110 to 120 acres had been used for inventory production by the Debtor and that land is no longer available to the Debtor for future use.

The Debtor's current Chapter 12 plan, as corrected by a supplement and clarification filed February 4, 2016, proposes to pay GNB as follows:

(a) The claims of GNB secured upon real property shall be consolidated and shall be treated as secured in the amount of $670,000.00, based upon the value of the collateral as determined by the Debtor. Upon confirmation, this creditor shall retain its liens pursuant to §1225(a)(5) of the Bankruptcy Code until this claim, to the extent secured, is paid in full. Any remaining debt owed to GNB and secured upon the real property of the Debtor that exceeds $670,000.00 shall be treated as an unsecured claim.  The creditor is to be paid by payments of principal and interest on the allowed secured claim over a term of twenty-five (25) years at an interest rate of 4.25%, with an annual payment of $44,028.73, payable on March 1st of each year commencing in 2016.  For the first five (5) year period following confirmation, payments in the amount of $44,028.73 will be made by the Debtor on an annual basis. These payments include interest at the rate of 4.25%, fixed for the first 5 years. Thereafter, the amount of the payment and the interest rate will be adjusted every 5 years, with the interest rate based on Wall Street Journal prime (base rate) +1%, with a floor of 4.25% and a ceiling of 9.25%. The floor rate and the ceiling rate include the base rate of +1%. The base rate will be as of the first business day of the month of the expiration of the fixed rate. All principal and interest will become due and payable on January 1, 2026.

(b) The claims of GNB secured upon the personal property of the estate shall be consolidated and treated as secured in the amount of $150,000.00, based

---

[3] The Court calculates the net foreclosure sale proceeds to be $414,328.90 based on the numbers provided by Mr. Young during his testimony.  Mr. Young did not calculate the total on the stand, but stated that counsel for GNB's calculation of $414,378.16 "looks pretty close."  The Court accepts counsel for GNB's calculation since that amount was stated on the record and is not prejudicial to the Debtor.

[4] The Order entered on December 22, 2015, required the Debtor to tender a payment of $15,000.00 "immediately" plus a payment of $10,000.00 on or before December 22, 2015, i.e., by the same date the order was entered. Counsel for GNB stated that the required $15,000.00 payment was tendered to GNB in January 2016.

upon the value of the collateral. Upon confirmation, the value of the personal property of the estate secured by the lien of GNB, shall be repaid over a term of seven (7) years with interest at 5%, with annual payments in the amount of $25,000.00 with the first payment being paid March 1st of each year commencing in 2016. The creditor shall retain its lien pursuant to §1225(a)(5) of the Bankruptcy Code until this claim is paid in full.

GNB filed its Motion to Dismiss Chapter 12 Case on January 7, 2016. In the motion, GNB argues that the Debtor's business operations and management has not improved since dismissal of the 2013 Case, that the Debtor continues to diminish the value of GNB's cash collateral, and that the Debtor continues to abuse the automatic stay while not acting in good faith. GNB also argues that the Debtor has no reasonable likelihood of rehabilitation, that the Debtor's gross mismanagement and unreasonable delay is prejudicial to creditors, that there is continuing loss to and diminution of the estate, that the Debtor has failed to file a timely plan and meet its duties to file operating reports and other financial information, and that the case has not been filed in good faith. Accordingly, GNB argues that cause exists to dismiss the case.

GNB also filed its objection to confirmation of the Plan on January 7, 2016, claiming that the instant case is a serial filing, undertaken to stay foreclosure sales scheduled by GNB following dismissal of the 2013 Case,[5] that that the Plan incorrectly states the amounts due to GNB on its secured claim,[6] that the Plan is not feasible or reasonable, that the Plan contains no supporting budget or financial projections, that the Debtor seeks to undervalue assets pledged as collateral, that the Debtor has failed to adequately repair and maintain tangible personal property, vehicles, and equipment pledged as collateral, and that the plan seeks to extend the payment to

---

[5] GNB notes that the Debtor also filed a Chapter 12 petition before this Court on June 8, 1992 (Case No. 92-01368). In that case, the Chapter 12 plan was confirmed by order entered on August 10, 1994, and a discharge was entered on September 23, 1999.

[6] GNB states that it holds a secured claim under Loan No. 8079443 (the "Loan") with a payoff balance of $1,283,692.15 plus interest and attorney's fees, and that the Loan is secured by real estate located in Wythe County, Virginia, four titled vehicles, additional non-titled vehicles and personal property, and all farm products and supplies, crops, trees, timber, goods, equipment, accounts, and all proceeds thereof.

GNB on its secured claim in an impermissible and unreasonable manner.[7]  GNB also argues that

the Plan is not in the best interest of the creditors, that the Plan unfairly discriminates between

the claims and classes of creditors, that the Plan is not commercially reasonable, and that the

value of property to be distributed to GNB on its claim is less than the claim's allowed amount.

GNB further argues that the Plan has not been proposed in good faith, and that the case was filed

in bad faith.

In its supplemental objection to confirmation filed February 4, 2016, GNB further claims

that the aggregate fair market value of the Real Property is at least $756,000.00, that the Debtor

has failed to produce adequate monthly operating reports despite repeated requests, and that the

Debtor has made, without GNB's knowledge or approval, certain unauthorized post-petition

payments to First Community Bank from funds constituting GNB's cash collateral.[8]  In addition,

GNB claims that the Plan impermissibly provides that all property of the Debtor will revest in

the Debtor upon confirmation, that the Plan impermissibly provides for payments over a six-year

period,[9] and that the Debtor has not properly provided for the IRS's claim in the Plan.

The Trustee's Supplemental 341 Report and Show Cause and Motion to Dismiss filed

February 2, 2016 provides that the Debtor's plan is not feasible, that that the Plan calls for direct

payment to GNB and another creditor, First Community Bank, rather than through the Trustee

acting as a conduit, and that the Debtor may have been making adequate protection payments to

First Community Bank from funds consisting of GNB's collateral without GNB's consent.

The IRS filed an objection to confirmation stating that it has no record that the Debtor

filed an Employer's Annual Federal Unemployment Tax Return (Form 940) for 2013, an

---

[7] The objection further argues that the Plan impermissibly seeks to relitigate Judge Connelly's ruling in the 2013 Case on this precise issue.
[8] GNB states that these unauthorized payments were disclosed at the Debtor's § 341 meeting of creditors.
[9] This resulted from a scrivener's error in the Plan, which the Debtor corrected to five years by the Plan Supplement.

Employer's Annual Federal Tax Return for Agricultural Employees (Form 943) for 2013, or a

U.S. Partnership Return of Income (Form 1065) for 2012 and 2013.  The IRS argued that it

cannot determine the correct amount of the Debtor's pre-petition tax liability until the Debtor

files the past due tax returns and gives the IRS a reasonable opportunity to examine the Debtor,

and thus, the IRS estimated its priority claim.[10]

Distilled to their essence at trial, the objections to confirmation and the motions to

dismiss focused on three areas: (1) valuation of GNB's real estate collateral, (2) feasibility of the

Debtor's proposed plan, and (3) delay prejudicial to creditors.  The Court will address those

seriatim.

Real Estate Valuation

The Debtor called Dianna Ryan ("Ms. Ryan") of Ryan's Appraisal Service in Wytheville,

Virginia.  Ms. Ryan testified in connection with her appraisals of the 144.5 Acre Tract and the

15.5 Acre Tract.  Ms. Ryan testified that she is a certified appraiser, has 20 years of experience

as a certified appraiser, is 50 percent owner of her business, and works with her daughter, Carol

Fowler, on all of her appraisal assignments.[11]  Ms. Ryan also testified that she has been

conducting appraisals since 1983, and her main geographic area is Wythe County, Virginia

where the Real Property is located.

Ms. Ryan indicated that she knew her appraisal would be used in court, and that she was

engaged by Curtis Keith to do the appraisal in this case.  Ms. Ryan frankly testified that when

she received a telephone call from Curtis Keith requesting an appraisal he wanted the "lowest

---

[10] The IRS filed its Objection to Confirmation of Chapter 12 Plan on December 18, 2015.  In the objection, the IRS states that it has a claim for pre-petition tax liability in the amount of $82,293.41, of which $34,397.38 is an unsecured priority claim, and $47,896.03 is an unsecured general claim.

[11] Ms. Ryan's mobility is limited due to health issues, and she was only able to do some of the site visits with the assistance of her daughter.  Upon hearing her testimony, the Court has no reservations about her professional capabilities in this matter, and the Court finds her to be a qualified expert witness for the purposes of this case.

value he could possibly get."  However, Ms. Ryan testified that she told Mr. Keith that "market value [is] market value," indicating that she would not be influenced by his desire to steer the valuation in a downward direction.[12]

Ms. Ryan further testified that she later conducted the appraisals and was "a little surprised they came in as high as they did."  Ms. Ryan also testified, when gathering comparable sales, the time frame used dated back 36 months due to the lack of more recent comparable sales to the Real Property.  Ms. Ryan also testified at length as to why certain land transfers are not appropriate for sales comparison, either because they are different types of land or they are not arms-length transactions.

Ms. Ryan initially described the 144.5 Acre Tract.  She testified that, when she visited the property, she could see the topography, but estimated that she only viewed approximately 50 to 60 percent of the property in person.  She also indicated that she viewed the property on Google Earth.[13]  Ms. Ryan also described the process for arriving at the four comparable sales used in generating her appraisal on the 144.5 Acre Tract.  Comparable No. 3 was a sale from November 2014, and Ms. Ryan testified that the deduction of $43,000.00 related to "road frontage" of 5,000 feet on the comparable versus only 500 feet on the 144.5 Acre Tract.  Ms. Ryan testified that, although road frontage is not necessarily that important for a tree farm, it does add value to the property and is important in generating appraisals.  Upon cross-examination by GNB's counsel, Ms. Ryan acknowledged that road frontage would not necessarily be as important to a prospective purchaser desiring to graze cattle, and admitted that she has not worked on any

---

[12] Despite Curtis Keith's health issues and his move to an assisted living facility, it is clear to the Court from the undercurrents at trial that his influential hand remains not far from the wheel in this family business.

[13] "Google Earth is a computer program that allows users to pull up a bird's eye view of any place in the world. It displays satellite images taken from far above the earth's surface with high-resolution cameras."  *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1108 (9th Cir. 2015).

appraisals where grazing cattle has affected the value, nor have any clients requested her to produce an appraisal taking cattle grazing into consideration.[14]

As to the 15.5 Acre Tract, Ms. Ryan testified that it contains several buildings, and parking lots, including a large building used for loading trees onto transfer trucks.  Ms. Ryan also testified that the property contains a shed used for storing pesticides and fertilizers, as well as an office and bathroom in one of the other buildings.  In addition, Ms. Ryan testified that the property includes a building where roping is made.  Ms. Ryan testified that, although she did not enter any of these buildings to inspect their interiors, she viewed these properties from a vehicle driven on the property and measurements were obtained on all buildings. Based on comparable sales in the area, which took into account variances in types of structures (among other variables and adjustments), Ms. Ryan arrived at a value of $223,000.00 for the 15.5 Acre Tract.  *See* Debtor Ex. 1, pt. 2, at 14.

In describing the method used for selecting the three comparable sales for the 15.5 Acre Tract, Ms. Ryan testified that she and Ms. Fowler selected the comparable sales after producing a spreadsheet of such sales in the area.  Ms. Ryan stated that she used the replacement cost minus depreciation based on the buildings' respective ages.[15]  None of the comparable sales appeared to be in or around the Town of Wytheville, a more urban part of the county.  On the appraisal, Ms. Ryan noted that she "has weighted comparable 3 as the strongest indicator due to similarities in topography and most recent sale."  Debtor Ex. 1, pt. 2, at 15.  She also noted, "Comparables 1 and 2 are considered to be good supporting data."  *Id.*

---

[14] Testimony at trial indicated that increases in beef prices have resulted in increased demand for grazing acreage.

[15] Ms. Ryan's testimony at trial was somewhat contradictory to her written report, where she stated as follows:
> The estimated market value is as of the effective date of the appraisal as defined by Fannie Mae. This appraiser has considered all three approaches to value while developing the appraisal for the subject property.  The cost replacement approach to value has not been utilized due to the limited scope and request by the client.  The income approach has also not been utilized due to the limited scope requested by the client.

Nevertheless, the Court found her explanation of value sufficiently grounded at trial to support her conclusions.

In turn, GNB called Edward C. Greer ("Mr. Greer"), a licensed appraiser in Virginia and North Carolina, of Greer Appraisal Services located in Independence, Virginia in connection with appraisals he conducted for GNB on the 144.5 Acre Tract and the 15.5 Acre Tract.  Mr. Greer testified that he has been an appraiser since 2001, and licensed in Virginia since 2004.[16] The area he appraises covers a broader geographic range than that of Ms. Ryan, and includes several counties in North Carolina.  Mr. Greer's appraisal of the 144.5 Acre Tract lists a value of $506,000.00, and contained three comparable sales.  Mr. Greer arrived at a value of $250,000.00 for the 15.5 Acre Tract, and the appraisal also contained three comparable sales.

Mr. Greer testified that he met with Curtis Keith, walked around the Real Property, and took pictures of the Real Property.[17]  As to the 144.5 Acre Tract, Mr. Greer testified that Curtis Keith took him to the "top" of the property and pointed out its boundaries.  Mr. Greer testified that the 144.5 Acre Tract could be suitable for cattle grazing if a potential buyer were interested. Mr. Greer also testified that he visited approximately five potential comparable sales, but was not satisfied with two of them.  Mr. Greer further testified that comparable 3 is the best comparable since it is located five miles away.

Addressing the 15.5 Acre Tract, Mr. Greer testified that he took pictures of "the larger building," but did not get a chance to view a chemical storage area, as it was closed.  Mr. Greer also testified that he was not able to view inside the other building because people were working inside.  In addition, Mr. Greer testified that comparable sales 1 and 3 were the best comparisons to the subject property.  Mr. Greer further testified that the current market has been stable and that his opinion as of the date of the trial has not changed regarding the values listed in his

---

[16] Mr. Greer further testified that he has appraised many different types of properties, including homes, shopping centers, and farms, and averages approximately 110 to 120 property appraisals per year.
[17] The appraised value date was November 16, 2015, with all indications that Curtis Keith was still actively participating in, if not running, the business when he met with Mr. Greer.

appraisals.  He also testified that, although Ms. Ryan took a different approach to valuing the buildings, her approach "was not too far off," and that he would have valued them slightly higher.  Mr. Greer further testified that he did not go into two of the three buildings on the 15.5 Acre Tract.

The Court finds that both appraisers, Ms. Ryan and Mr. Greer, are credible witnesses and proficient at their craft.  The Court further finds that Ms. Ryan properly discharged her professional duties in performing her appraisals independent of Curtis Keith's efforts to suggest she move in a downward direction.  However, the appraisers did come to different assessments of value.  The Court finds Mr. Greer's appraisal of the 144.5 Acre Tract to be the more accurate, particularly given the significant adjustments made by Ms. Ryan due the lack of road frontage. In the current market, with so little of the land in this geographic area being sought for development, and the demand for "rolling farmland" being more for agriculture, the Court finds the deductions for lack of road frontage to be on the generous side.  In addition, Mr. Greer's comparable sales were collectively closer in time, and with those two factors considered, the Court believes the scale tips toward the Greer Appraisal as the more persuasive.  Thus, the Court finds the value of the 144.5 Acre Tract to be $506,000.00.

In contrast, the Court finds Ms. Ryan's valuation of the 15.5 Acre Tract to be the more compelling, primarily because Mr. Greer used sales in the Wytheville business area as comparable sales, as opposed to the more rural comparable sales used by Ms. Ryan.  The latter seem to the Court to match up more in terms of compatibility than those in the business area closer to or in town.  Indeed, Terry Keith testified that the Real Property at issue is fairly isolated.  To match up with the subject property, each of Mr. Greer's comparable sales in or around Wytheville had to take significant deductions due to location to arrive at a value. Like

deductions for lack of road frontage, such significant estimated deductions, even if based on

professional judgment, give the Court some pause for concern.  The Court finds the 15.5 Acre

Tract to have a value of $223,000.00.  The combined value of both parcels of real estate is

determined to be $729,000.00.

<u>Feasibility and Delay Prejudicial to Creditors</u>

James Young ("Mr. Young"), a senior vice president and senior credit officer employed

by GNB, testified on behalf of the Bank. He has substantial experience in commercial lending,

credit underwriting and loan pricing, as well as troubled loan workouts.  He is also experienced

in various types of agricultural lending, including cattle farming and Christmas tree and tree

nursery operations, including the market pricing and structure for such loans in the relevant

market area.  He was familiar with this Debtor's history with the bank, including its past

financial performance.  Looking at the Debtor's ability to generate operating cash flow for the

repayment of debt, Mr. Young testified the Debtor's revenue has been on a downward trend

since 2012, dropping from $1,046,997.00 in 2012 to $836,776.00 in 2015.[18]  Operating cash flow

available to service debt has dropped from $156,397.00 in 2012 to $63,648.00 in 2015.  Unlike

the 2013 Case, where the Debtor provided questionable and unreliable cash flow projections, the

Debtor in this case has provided no cash flow projections at all.

Mr. Young testified that the market for agricultural loans would not support a 25-year

amortization or a prime plus one interest rate for a loan of this type, especially with the loan

history of this borrower and with its financial status and collateral package.  The amortization

would be shorter, with a balloon, and with a higher interest rate.  Nevertheless, using the number

the Debtor has proposed on value ($670,000.00), and working off the 2015 profit and loss

---

[18] The Debtor's loan matured on July 15, 2011, with balance at maturity of $1,373,736.88.  The loan currently bears interest at a variable rate of prime plus 3%, with a floor of 5.75%.  The current rate is 6.5%.

statement, an annual payment on the real estate at the Debtor's proposed rate of 4.5 percent

would result in an annual payment of $44,044.00. Adding in an annual payment of $25,927.00,

which is what it would take to amortize the equipment loan at the Debtor's proposed rate under

the plan over seven years, and $12,000.00 to another lender on a separate loan, would bring

annual debt service to $81,971.00.[19]

Mr. Young further testified that for farm land and improved property such as that owned

by the Debtor, the bank's underwriting guidelines generally call for a 15-year amortization. This

is consistent with the market. Thus, the proposed $44,028.73 annual payments in the Chapter 12

Plan on the loan secured by the Debtor's real property is not realistic, and further, an interest rate

of 4.25 percent is not reasonable. Indeed, Mr. Young testified that a high quality construction

loan on a residential home would carry a rate of approximately 5.0 percent, and it would be taken

out by a permanent loan once the construction was complete. Thus, there is a relatively low risk

of default. Debtor's counsel argued that a 25-year amortization is shorter than a 30-year

amortization, which Judge Connelly found unreasonable in the 2013 Case, and shorter than that

found in the residential market. This loan is far different than those found in the residential

market. The testimony reflects there is no secondary market for these types of loans, and given

the risk of default and the risk of loss, including this borrower's track history with the bank, the

Debtor's proposal merits a much higher interest rate—more than prime rate plus a modest

upward adjustment—and a much shorter amortization. Mr. Young addressed the loan secured by

the personal property as well. He testified that, on used equipment, an amortization term of no

---

[19] Terry Keith testified that the proposed Chapter 12 Plan requires payments of $1,000.00 per month to First Community Bank pursuant to the Class 4 claim, and that Verna Keith has agreed to pay $34,000.00 to First Bank of Virginia for the remaining debt of the Debtor and its two co-makers pursuant to the Class 5 claim. Mr. Young testified that required annual debt service would be one dollar more than the Court's calculation, i.e. $81,972.00—the Court's calculation is based on the whole numbers provided by Mr. Young in his testimony.

more than three years is used, and that no lender in the market would allow for a seven-year

amortization on the Debtor's used equipment.

Using the Debtor's proposed numbers, annual debt service of $81,971.00 would just

barely be covered by the Debtor's performance in 2014.  The Debtor would be over $18,000.00

short based on 2015 cash flow numbers.  However, the Bank makes a compelling argument that

the amortization is far too long, which if reduced, would increase the annual payment.  In

addition, the interest rate is too low, which if raised, would also make the annual payment go up.

Further, the amortization on the equipment is unrealistic in the market in terms of length, which

would make that annual payment go up as well.  The Court has already found the Real Property

to be valued $59,000.00 higher than the Debtor has proposed, which would also increase the

annual payment.  On the revenue side, the Debtor has lost approximately 110 to 120 acres of

land used in tree production, which will not be available to generate revenue to replicate even

close to the 2014 numbers.  The fact that 2015 revenues were much less than 2014 revenues is

consistent with a loss of saleable inventory.  In short, under the Debtor's best case scenario, it

cannot make the proposed plan payments, and the various factors that work against its best case

scenario dig the hole even deeper.[20]

As pointed out above, GNB's loan to the Debtor matured July 15, 2011, and Mr. Young

testified that the Debtor rejected a proposed forbearance agreement prior to the 2013 Case being

filed.  The 2013 Case was filed on August 14, 2013, and was not finally disposed of by the

District Court until August 4, 2015.  In the nearly two years the 2013 Case was pending, the

Debtor proposed four different Chapter 12 plans, none of which were confirmed.  The Court in

the 2013 Case denied the Debtor an opportunity to file and pursue a fifth Chapter 12 Plan, and

---

[20] Terry Keith testified that the Debtor has enough cash on hand to make the first year plan payment.  However, as explained below, that is not the test for plan feasibility.

dismissed the case.  A critical component of the decision to dismiss the case was the Debtor's

complete inability to put forth any realistic or even understandable projections as to future

financial performance.  Here, the Debtor has a different problem, but yet again, one of its own

creation.  It has been in this case since September 4, 2015, and over five months later, an

evidentiary hearing was held on confirmation with no financial projections provided whatsoever.

Not unreasonable ones.  Not ill-prepared ones.  Simply, none at all.

The Debtor generated and provided financial reports at the continued 341 meeting on

January 19, 2016.[21]  However, neither Terry Keith nor Larry Keith were prepared for, or able to

testify about, the 2015 financial records at the creditors' meeting.  Given that no projections as to

future performance were provided in advance of or otherwise introduced at trial, based on an

objection from GNB, the Court barred the Debtor from introducing evidence by testimony as to

projections of future performance.

While the Court notes that the Debtor's debt to GNB was reduced from the time of Judge

Connelly's ruling by almost $500,000.00, the Court cannot ignore several counter-balancing

factors.  The Court has already discussed that a significant part of the Debtor's real estate was

sold to generate the largest portion of that sum, and that property is no longer available for

revenue production.  However, the Court is mindful that counsel for the Debtor in the 2013 Case

is the same counsel for the Debtor in this case.  The learning curve is not as steep as if new

counsel were coming at this anew.  The expectations of the Court—and the Debtor's deficiencies

in the 2013 Case—were well known both to counsel and to the Debtor when this case was filed.

To show up at the confirmation hearing over five months into the case with no financial

---

[21] Counsel for the Debtor was asked by counsel for GNB to provide information on purchase orders for 2016 in advance of trial, but that information was not provided.  The Court sustained GNB's objection when the Debtor tried to introduce information about those purchase orders, as Debtor's counsel claimed he did not recall receiving the request asking for them.  When asked by the Court if he had reason to disbelieve the request was made, Debtor's counsel answered he did not.

projections at all, after having the 2013 Case dismissed for faulty financial projections, is truly troubling to the Court.  Counsel for GNB also made much of the Debtor's failure to produce requested cancelled checks and supporting information to the financial reports produced at the creditors' meeting, and Terry Keith had no explanation as to why they were not produced in advance of trial, even though he knew exactly where they were at the office.  At closing argument, counsel for the Debtor stated, in summary, that he was aware of the need for a budget and projections, but he cannot produce what he does not have and cannot get, and counsel must take his clients as they are.  In the meantime, the stay remains in effect, GNB is held at bay, and the Debtor continues to occupy and utilize its collateral.

## Conclusions of Law

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on December 6, 1994, and Rule 3 of the Local Rules of the United States District Court for the Western District of Virginia.  This Court further concludes that this matter is a "core" bankruptcy proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (L), and (O).

## I.      Denial of Plan Confirmation

### A.  Burden of Proof and Plan Confirmation Requirements

A Chapter 12 debtor bears the burden of proof by a preponderance of the evidence to show that a proposed plan should be confirmed.  *In re Pressley*, 502 B.R. 196, 202 (Bankr. D.S.C. 2013).  Similarly, if a creditor challenges any element required for Chapter 12 plan confirmation, the debtor maintains the burden of proving its compliance therewith.  *Keith's Tree Farms v. Grayson Nat'l Bank*, 535 B.R. 647, 652 (W.D. Va. 2015) (citing *In re Brown*, 244 B.R. 603, 607 (Bankr. W.D. Va. 2000)).

17

<u>Feasibility</u>

Section 1225(a) sets forth the requirements for a Chapter 12 plan to be confirmed. *See* 11 U.S.C. § 1225(a). Section 1225(a)(6) of the Code requires a Chapter 12 debtor to "be able to make all payments under the plan and to comply with the plan," i.e., the plan must be feasible. 11 U.S.C. § 1225(a)(6); *see also In re Keith's Tree Farms*, 519 B.R. 628, 637 (Bankr. W.D. Va. 2014). As the Court stated in the Debtor's previous Chapter 12 case, courts within the Fourth Circuit consider "the debtor's historical performance and current condition of the debtor's business" when evaluating feasibility. *Keith's Tree Farms*, 519 B.R. at 637 (citing *Farmers Home Admin. v. Rape (In re Rape)*, 104 B.R. 741, 748-49 (W.D.N.C. 1989)). Moreover, "[s]incerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *Id.* (quoting *Rape*, 104 B.R. at 749). A determination of feasibility is "never certain, particularly in farm situations," but "[n]evertheless, the ultimate burden of establishing feasibility, as with all elements of confirmation, rests on the debtor." *Id.* (citations omitted). Accordingly, a Chapter 12 debtor "must persuade the court that 'it is probable, not merely possible or hopeful, that the Debtors can actually pay the restructured debt and perform all obligations of the plan.'" *Id.* (quoting *Rape*, 104 B.R. at 749). When "considering the evidence, 'the court should give the Chapter 12 debtor the benefit of the doubt regarding the issue of feasibility when the debtor's plan projections use reasonable data in light of the current economic climate.'" *Id.* (quoting *In re Hughes*, No. 06–80219, 2006 WL 2620438, at *3, 2006 Bankr. LEXIS 2288, at *7 (Bankr. M.D.N.C. Sept. 11, 2006)).

As the District Court stated, "Feasibility is 'fundamentally a fact question.'" *Keith's Tree Farms*, 535 B.R. at 652 (citing *Rape*, 104 B.R. at 748). Even giving the Debtor the benefit of the

doubt, the Court finds that the proposed Plan is not feasible. The Debtor's revenue has been in decline every year since 2012 and the Debtor has provided no indication that it has the ability to turn this operation around. Although the Debtor has provided some $500,000.00 in payments to GNB since the conclusion of the 2013 Case, such payments were largely the result of liquidating assets of the Debtor used to generate its main source of revenue, i.e., property on which to grow trees. Even if the Court were to accept the Debtor's proposed property valuation, interest rate and amortization term, which it does not, based on 2015 performance and available cash flow, the Debtor cannot make the proposed payments under the Plan. The evidence reflects that any upward adjustment in property valuation (which the Court has already found), or any shortening of the amortization period or increase in the interest rate, all would increase the annual debt service payment. The Court sees no scenario where the Debtor can make the proposed plan payment based on past cash flow, and the Debtor has provided no budget or cash flow projections going forward to show that it even has a reasonable basis for doing what the Debtor believes it can do.

Given the complete lack of a record at trial that would substantiate that "the [D]ebtor will be able to make all payments under the plan and to comply with the plan," the Court cannot find the plan to be feasible. *See Keith's Tree Farms*, 535 B.R. at 652. It is not probable, as opposed to possible or hopeful, that the Debtor "can actually pay the restructured debt and perform all obligations under the plan." *See id.* at 652. Thus, confirmation of the Debtor's Chapter 12 Plan is denied.[22]

---

[22] Because the Court finds that this element of confirmation is not met, and that confirmation can be denied on that basis alone, it need not address all the other various elements of confirmation. *See In re Colston*, 539 B.R. 738, 749 n.20 (Bankr. W.D. Va. 2015).

## II.      Denial of Leave to Amend

Section 1208(c)(5) of the Code authorizes the Court to dismiss a debtor's Chapter 12 case if confirmation is denied and leave to amend is denied.[23]  *Keith's Tree Farms*, 519 B.R. at 642 (citing 11 U.S.C. § 1208(c)(5)).  The Court dismissed the 2013 Case because the Debtor proposed four Chapter 12 plans, none of which were confirmable.  *See id.* at 642-44.  Like that case, "[a] successful confirmation seems unlikely at this point, considering the consistent objections to confirmation, lack of evidence sufficient to overcome the objections, and the inability of the [Debtor] and its creditors to reach agreement on any aspect of the plan."  *Id.* at 642.  Where no reasonable likelihood of reorganization exists, requests for additional time should be denied.  *Id.*[24]

The Court concludes that the Debtor has failed to show any reasonable likelihood of reorganization.  Because the Court does not believe that authorizing additional time to file an amended plan is in the best interest of the creditors, and would again be fruitless, the Court denies leave to amend.

## III.      Dismissal of the Case for Abuse

In *Dickenson*, the Court set out the approach to determining whether a Chapter 12 case should be dismissed for abuse:

> The Bankruptcy Code outlines the circumstances justifying dismissal of a case in section 1208(c).  Specifically, subpart (c)(1) provides, "the court shall dismiss a case under this chapter for cause, including . . . unreasonable delay, or gross mismanagement, by the debtor that is prejudicial to creditors . . . ." 11 U.S.C. § 1208(c)(1). The Code does not specify a particular length of delay that is considered per se "unreasonable" or "prejudicial;" however, examples of what

---

[23] Counsel for the Debtor inquired of the Court at trial what it would approve in terms of a modified plan structure, in essence a *de facto* request for leave to amend. However, in the circumstances of this case, the Court declines to make such an assessment.

[24] At trial, for substantially these reasons, the Chapter 12 Trustee in this case, who was also the Chapter 12 Trustee in the 2013 Case, advocated dismissal as opposed to allowing the Debtor another chance to put forth a proposed Chapter 12 Plan.

courts have found to be unreasonable are abundant. *See, e.g.*, *United States v. Suthers (In re Suthers)*, 173 B.R. 570 (W.D. Va. 1994) (ruling the bankruptcy court's decision not to dismiss a case was an abuse of discretion, when the debtor failed to confirm multiple amended plans over a span of just under three years and violated various court orders, and directing dismissal of the petition for "unreasonable delay"); *In re Carroll*, No. 13–08930, 2014 WL 3571535 (Bankr. W.D. Mich. July 14, 2014) (holding the debtors' failure to file an amended plan "promptly," as indicated by the court's denial of confirmation of an earlier plan and refusal to adjourn the hearing, was "unreasonable" under the circumstances and ran afoul of the intended "swift" disposition of chapter 12 cases). Consequently, the Court will determine if cause for dismissal exists by considering the specific facts of this case, including the length of the delay, the reason for or explanation of the delay, the impact of the delay on creditors, and how close the debtor is to having a viable plan ready for confirmation.

*In re Dickenson*, 517 B.R. 622, 632 (Bankr. W.D. Va. 2014).  Additionally, "unreasonable delays can result from failure to timely file documents, failure to file a confirmable plan, failure to file a modified plan, or failure to perform under a confirmed plan."  *Keith's Tree Farms*, 519 B.R. at 643.  Moreover, "gross mismanagement can be demonstrated by failure to provide accurate financial information . . . ."  *Id.* (citing *In re Pertuset*, 492 B.R. 232, 252 (Bankr. S.D. Ohio), *aff'd*, 485 B.R. 478 (B.A.P. 6th Cir. 2012)).

Since the filing of the 2013 Case, it has been over two-and-a-half years and the Debtor has yet to propose a confirmable plan to the Court.  Several of the same or similar issues that arose in the 2013 Case, which was also dismissed by the Court, have been resurrected in the instant case, despite the clear road map laid out before the Debtor in the rulings in the 2013 Case. The Debtor has not provided sufficient financial information to the Trustee or GNB to verify the Debtor's financial outlook.  Yet again, the Debtor is not in a position to put forth a confirmable plan while holding its creditors at arm's length.

Therefore, the Court will dismiss the Debtor's Chapter 12 case as a result of the Debtor's unreasonable delay and gross mismanagement.  Because of the circumstances surrounding this case, including the failure of the Debtor to propose a confirmable plan and denial of leave to

amend the plan again in this case, combined with the Debtor's history in the 2013 Case, the case

shall be dismissed with prejudice, including a bar to refiling for 365 days from entry of the order

filed contemporaneously herewith.

## CONCLUSION

As set forth above, the Court DENIES confirmation of the Debtor's Chapter 12 Plan and

DENIES leave to amend the plan further.  The Debtor has failed to satisfy the requirements of

Section 1225(a)(6).  Further, pursuant to Section 1208(c)(1) and (5), and due to the nature of the

Debtor's history in both the instant case and the 2013 Case, the Court dismisses the Debtor's

case with prejudice, including a bar to refiling for 365 days.

A separate Order will be entered contemporaneously herewith.

Decided this 18th  day of March, 2016.

UNITED STATES BANKRUPTCY JUDGE